JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JUNG WOOK NA,**<br>**Petitioner,**<br><br>**vs.**<br><br>**JASMINE NA,**<br>**Respondent.** | **Case No. 8:25-CV-02479-DOC-ADS**<br><br>**ORDER AND JUDGMENT GRANTING PETITION IN PART[1]; FINDINGS OF FACT & CONCLUSIONS OF LAW** |

[1] This opinion serves as a Findings of Fact and Conclusions of Law. Additional enumerated Findings of Fact and Conclusions of Law are appended to this order.

This case arises under the Hague Convention's International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§9001 *et seq.* The parties are the parents of K.E.N and S.A.N. They disagree regarding which country—the United States or South Korea—is the home of their shared children. The Court held an eleven-day evidentiary hearing (the "trial"). For the reasons described below, the Court **ORDERS** the return of S.A.N to South Korea, while K.E.N shall remain in the United States. The Court will not be addressing custody arrangements, as this is an inappropriate use of judicial power under ICARA.

## I. BACKGROUND

### A. Facts

The parties' met in the United States and they married while residing in Asia. Dkt. 26 at 3. Both children were both in South Korea and are dual citizens of South Korea and the United States. *Id*. K.E.N was born on December 22, 2014 and S.A.N was born on April 15, 2019. *Id.* Jasmine Na, ("Mother" and "Respondent"), currently resides in the United States and is an United States citizen. *Id*. at 1. Jung Wook Na, ("Father" and "Petitioner"), is a South Korean citizen who resides in South Korea. *Id.* The family resided in South Korea before Mother and Father separated. *Id. at 3*.

Mother moved out of the marital residence around 2020. *Id.* at 4. Since then, the parties have been separated, but are still legally married. Mother moved back to the United States around May 2021 without the children. *Id*. Around July 2021 both children started residing in the United States with Mother. *Id*. S.A.N returned to South Korea in December 2021 to reside with Father and K.E.N returned to South Korea in June 2022 to reside with Father too. *Id.* The children came to the United States for a brief visit in December 2024. *Id.* Since 2021, Mother has visited the children in South Korea on multiple occasions such as trips in August 2022, June 2023, July 2023, March 2025, and July 2025. *Id*. She has also since June 2023 visited the children in Taiwan on multiple occasions. *Id.*

Around July 18, 2025 Mother traveled to South Korea to visit the children. *Id.* at 6. On July 31, 2025 Mother removed both children from South Korea to the United States. Father was away on a church retreat and Mother asked to take both children to Disneyland in Tokyo while

he was away. *Id.* Father consented to this trip. Instead of taking the children to Japan, Mother took the children to the United States. *Id*. at 6. Both children had been residing in the United States since then until the Court ordered S.A.N to return to South Korea for two months in Summer 2026. S.A.N has since returned to the United States and both children are currently residing in the United States.

On October 13, 2025, Father, through the Orange County District Attorney, filed a petition under the Hague Convention in the Superior Court of California, County of Orange. Dkt. 26 at 6.

The Court notes that neither parent has visited each other's respective country since this case began. For Father, a previous criminal record in the United States has made it impossible for him to receive a visa to the United States for the past twenty years. *Id.* at 3. Due to ongoing custody determinations being made in South Korea, Mother has expressed fear to this Court about returning to South Korea.

**B. Procedural History**

Respondent removed this case from Orange County Superior Court ("Notice") (Dkt. 1) on November 4, 2025. Petitioner filed his Motion to Remand ("Motion to Remand") (Dkt. 9) the case back to state court on November 19, 2025. Respondent opposed the Motion to Remand (Dkt. 11) on November 25, 2025. The Court denied Petitioner's Motion to Remand on December 5, 2025. Petitioner filed his Amended Summary of Evidence (Dkt. 15) on January 5, 2026, and Respondent filed her Trial Brief on the same day (Dkt. 16). The parties' filed their Joint Statement of Stipulated Facts (Dkt. 26) on January 21, 2026. Loni Jo Poyner Klein was appointed the Guardian ad Litem ("Guardian ad Litem") for K.E.N and S.A.N on January 28, 2026. The Court held a non-consecutive, eleven-day evidentiary hearing.

## II. LEGAL STANDARD

The 1980 Hague Convention on the Civil Aspects of International Child Abduction is a multilateral treaty that provides authority for the expeditious physical return of a child who has been removed or retained from the habitual residence, in violation of the custody rights of the left-behind parent. Hague Convention on the Civil Aspects of International Child Abduction

pmbl., arts. 1, 3, Oct. 25, 1980, 1343 U.N.T.S. 89. The United States signed the 1980 Hague Convention in 1981, and Congress ratified the Convention in 1986. Hague Convention, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89. South Korea is also a party to the convention. *Id.*; Hague Conference on Private International Law, Status Table, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 (Feb. 11, 2025). Congress then passed implementing legislation, the International Child Abduction Remedies Act (ICARA) in 1988. 22 U.S.C. §§ 9001–9011 (1988), Pub. L. 100–300, § 2, Apr. 29, 1988, 102 Stat. 437. The primary purpose of the Hague Convention was to preserve the status quo that existed before a child's removal, and to deter would-be abductors from removing children to other jurisdictions in search of a more sympathetic court. Pub. Notice 957, 51 Fed.Reg. 10494, 10505 (1986). The policy underlying the Convention is "the interest of children . . . in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence." *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) (internal citation and quotation omitted).

It is important to note at the outset that the Court's purview is limited under the Convention. The Court is not to stand as a judge of who is the better parent, as a Hague Convention case is not a child custody case. *Golan v. Saada*, 596 U.S. 666, 671 (2022) (citing 22 U.S.C. § 9001(b)(4) ("The Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims.")). Rather, because the country that is the habitual residence of the child is a better judge of that issue, the Court is to provide a "provisional remedy." *Id*. (quoting *Monasky*, 589 U.S. at 72). This remedy is to determine if a child was wrongfully removed or retained away from their habitual residence, and if so, to order the child's return to that nation. *Id.* at 671-72 (citing 22 U.S.C. § 9003(e)(1), § 9001(a)(4)). Whether the taking is wrongful is determined by the law of the habitual residence. *See* Hague Convention art. 3-4, Oct. 25, 1980, 1343 U.N.T.S. 89.

Upon return of the child to their habitual residence, the custody adjudications will proceed in that forum. *Monasky,* 589 U.S. at 72. The elements of the case for return are that the

person or parent petitioning for the return must show by a preponderance of the evidence that the child:

1. Is under the age of sixteen;
2. Has been wrongfully removed or retained;
3. Has been wrongfully removed or retained from his or her habitual residence; and
4. Has been wrongfully removed or retained in violation of the custody rights of the left-behind parent.

Hague Convention art. 3-4, Oct. 25, 1980, 1343 U.N.T.S. 89; 22 U.S.C. § 9003(e)(1) (establishing the burden of proof).

If the petitioner has proven the elements above in accordance with their burden, the Court must order the return of the child unless a defense to return is established. Hague Convention arts. 12–13, 20, 1343 U.N.T.S. 89; 22 U.S.C. § 9003(e)(2). There are five narrow defenses to return, however, the only defense raised in this case is that return of the child would cause grave risk of harm to the child. Hague Convention arts. 12–13, Oct. 25, 1980, 1343 U.N.T.S. 89; 22 U.S.C. § 9003(e)(2)(A); *see* Trial Tr. Feb. 3, 2025 Rep Tr., 8. Respondent must establish this defense by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A).

**III. DISCUSSION**

Element one for return is not disputed because K.E.N is twelve-years old and S.A.N is seven-years old, making them both under the age of sixteen. Dkt. 26 at 3. The Court finds that when K.E.N and S.A.N were taken from South Korea, and flown to the United States without Father's consent, South Korea was the children's habitual residence. The Court also finds that Mother's taking of the children was in breach of Father's custodial rights under South Korean law, which he was exercising at the time of the wrongful taking. However, a defense to turn has been clearly established for K.E.N.

**A. Habitual Residence**

The term "habitual residence" is not explicitly defined by the Hague Convention itself. A substantial body of caselaw has developed, however, to establish a standard for determining habitual residence. *Mendez v. May*, 778 F.3d 337, 346-347 (1st Cir. 2015);

*Blackledge v. Blackledge*, 866 F.3d 169, 179-180 (3d Cir. 2017); *Friedrich v. Friedrich,* 983 F.2d 1396, 1401 (6th Cir. 1993); *Robert v. Tesson*, 507 F.3d 981, 989 (6th Cir. 2007); *Pfeiffer v. Bachotet*, 913 F.3d 1018, 1024 (11th Cir. 2019). A frequently cited case is *In re Bates,* a United Kingdom decision that helped define the concept of habitual residence and states: "[a]ll the law requires is that there is a settled purpose. That is not to say that the propositus intends to stay where he is indefinitely. Indeed, his purpose while settled may be for a limited period. Education, business or profession, employment, health, family or merely love of the place spring to mind as common reasons for a choice of regular abode, and there may well be many others. All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled." No. CA 122.89 at 9-10, High Court of Justice, *9 Fam. Div'n Ct. Royal Court of Justice, United Kingdom (1989).

The Supreme Court in *Monasky,* further emphasized that courts should consider a broad range of factors when determining habitual residence, as this determination is "a fact-driven inquiry into the particular circumstances of the case." 589 U.S. at 79. The totality-of-the-circumstances approach often examines the "family and social environment in which [the child's] life has developed." *Id.* at 77 (internal citation omitted). The Court clarified that "[t]here are no categorical requirements for establishing a child's habitual residence—least of all an actual-agreement requirement for infants." *Id.* at 80-81. Among the factors the Court cited as relevant in this analysis are the child's age, meaningful connections with the people and place in the new country, immigration status of the caregiving parents, and the length of time the child was physically located in a particular place. *Id.* at 78 n.3 (internal citations omitted). But this is not an exhaustive list.

Father argues that South Korea is the children's habitual residence, while Mother asserts that South Korea was never meant to be the family's permanent residence. The Court finds that children's habitual residence is South Korea. The evidence supporting this conclusion is substantial.

**1. Physical Presence**

The Court will first address the physical presence of the parties and relevant family members. The Ninth Circuit in *Nisbet v. Bridger,* 124 F.4th 577, 584 (9th Cir. 2024) defined a child's habitual residence as "the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective." (internal quotations and citations omitted). Further, the Court stated that this approach considers whether the child "acquired a sense of environmental normalcy by forming meaningful connections and the people and places he encountered." *Id.*; *see also Monasky,* 589 U.S. at 77 (noting the Hauge Convention's explanatory report referred to a child's habitual residence as "the family and social environmental in which [the child's] life has developed" (alternation in original) (citation omitted)).

While physical presence of the child alone is not dispositive, it must be considered alongside meaningful social connections and a sense of environmental normalcy. *See id.* at 588 (citing *Monasky,* 589 at 81). However, when physical presence fails to yield meaningful social connections, courts assign it little weight in habitual-residence determinations. *Id.*

Both children were born in South Korea and spent most of their childhoods there. Dkt. 26 at 4. With this background in mind, the Court focuses first on examining the children's familial presence in South Korea. Given that habitual residence is determined by assessing the child's meaningful connections and environmental normalcy, it is necessary to analyze the familial and social environment in South Korea, as this is where the children resided for most of their lives.

**Mother's Presence in South Korea**

Though Mother has visited South Korea several times since her return to the United States in 2021, the children have remained in South Korea other than a short visit in 2024. Dkt. 26 at 4.

**Extended Family in South Korea**

The children live with their paternal grandparents and nanny in South Korea. Dkt. 66 at 2. Though the children have maternal grandparents in the United States, they did not grow up living with them. Therefore, the children's closer familial connections would be in South Korea.

**Connections to South Korea**

In *Nisbet,* the Ninth Circuit examined whether two children had acclimatized to Scotland by assessing their connections to the people in their physical social environment, including family, friends, and parents. 124 F.4th at 585. Unlike this case, the court there affirmed that the children lacked meaningful ties to Scotland even though they were physically present there because they had not formed friendships at nursery school, had no contact with their extended family, and had a father who had been incarcerated since birth. *Id.* By contrast, here both children have strong relationships with their grandparents, nanny, extended cousins, and friends whom they have known since birth. Dkt. 66 at 2. The children can speak Korean and have all of their personal belongings in Korea. Even Respondent admits in her briefing the "substantial facts favoring Korea" as the habitual residence such as the children having "lived there for years, attended school, had familiar routines, and maintained relationships." Dkt. 65 at 11.

**2. Intentions and Circumstances of Parents**

The Court next addresses the parents' intent and circumstances regarding establishing a home for both children. Because parents often dispute their intentions during litigation, "the court should look at actions as well as declarations in determining [parental intent]." *Olivia v. Espinoza,* No.: 20CV01133-JAH-DEB, 2021 WL 4554579 at *6 (S.D. Cal. Oct. 5, 2021) (citing *Walker v. Walker,* 701 F.3d 1110, 1119 (7th Cir. 2012). Mother contends that Father's retention of immigration counsel to facilitate a return to the United States, communication between the parties about eventually raising the children in the United States, and the children's English-language curriculum point towards South Korea not being the children's habitual place of residence. Dkt. 65 at 3-4. Though these things may have been true, the fact of the matter remains that the children had only lived in the United States for about a year prior to being taken by

Mother in 2025. The have known no other country as their home, other than South Korea, since their birth. It is clear to the Court that the children's habitual residence was South Korea at the time of their taking, despite what any future intent may have been for the children's residence in the United States.

**B. Violation of Custody Rights Under South Korean Law**

Having established that the children's habitual residence was South Korea, the Court must now determine (1) whether Mother's removal of the child breached Father's custody rights under South Korean law and (2) whether Father was exercising those rights at the time of removal. *See* Hague Convention art. 3-4, Oct. 25, 1980, 1343 U.N.T.S. 89; 22 U.S.C. §9003(e)(1) (establishing the burden of proof).

**Custody Rights Under Korean Law**

Under the Hague Convention, removal is wrongful if it violates the custody rights of the left-behind parent as recognized by the child's habitual residence. *Id.* Custody rights can be established by (1) operation of law, (2) judicial or administrative decision, or (3) agreement between the parents. Hague Convention art. 3, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89.

Korean law mandates that parental authority is exercised jointly over minor children. *See* Korean Civil Act art. 909(2) (S. Kor.). If parents are unable to reach an agreement, the Korean family court steps in. *Id.* At no point did mother appeal to the Korean family court for guidance over where the children shall reside. Instead, she simply took the children in violation of Korean law.

**International Comity and the Hague Convention**

The Hague Convention was founded on principles of international comity, ensuring that courts respect the custody determination of other signatory nations. *Souratgar v. Fair*, 720 F.3d 96, 108 (2nd Cir., 2013) ("the careful and thorough fulfillment of our treaty obligations stands not only to protect children abducted to the United States, but also to protect American children abducted to other nations-whose courts, under the legal regime created by this treaty, are expected to offer reciprocal protection.") (international citation and quotation omitted). ("In the exercise of comity, we are required to place our trust in the court of the home country to

issue whatever orders may be necessary to safeguard children who come before it.") (internal quotation and citation omitted). It would go against the Hauge Convention to allow parents to conceive children in one country, establish a home there, and then, upon dissatisfaction with the relationship or living situation, remove the children to another country in hopes of securing a more favorable outcome in a foreign jurisdiction.

At the time of Mother's departure with the children, there was no court order governing the parents' custody rights. However, the evidence establishes that there was an agreement for the children to remain in South Korea for the time being. Otherwise, Mother would have never consented to send the children back to South Korea in 2021 and 2022. By disregarding South Korean law and removing the child without legal authorization, Mother acted in clear violation of Father's custodial rights.

**C. Father's Defenses**

**1. Grave Risk of Harm**

There is a uniform acknowledgement among courts that the defenses available under the Convention should be interpreted narrowly. *See, e.g., Nicolson v. Pappalardo*, 605 F.3d 100, 107 (1st Cir. 2010); *Asvesta v. Petroutsas*, 580 F.3d 1000, 1004 (9th Cir. 2009); *Baran v. Beaty*, 526 F.3d 1340, 1345 (11th Cir. 2008) (using Article 13(b) defense); *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 271 (3d Cir. 2007) (using Article 13 defense); *Karkkainen v. Kovalchuk*, 445 F.3d 280, 288 (3d Cir. 2006); *Miller v. Miller,* 240 F.3d 392, 402 (4th Cir. 2001); *Diorinou v. Mezitis*, 237 F.3d 133, 145 (2d Cir. 2001); *England v. England*, 234 F.3d 268, 272 (5th Cir. 2000); *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996); *Rydder v. Rydder*, 49 F.3d 369, 372 (8th Cir. 1995). This is to prevent the Convention from becoming "a dead letter." *See* Elisa Pérez-Vera, Explanatory Report, in 3 Actes et Documents de la Quatorzième session, 434-35 (1982), https://www.fjc.gov/content/311576/explanatory-report-eliza-perezvera-report (the Pérez-Vera Report is the official commentary of the reporter to the proceedings leading to the adoption of the 1980 Hague Convention by the Hague Conference on Private International Law). In fact, Article 18 provides that the defenses "do not limit the power of a judicial or administrative authority to order the return of the child at any time." Hague Convention art. 18.

Thus, if the return of a child would further the aims of the Convention, Article 18 confers discretion to return a child even if a defense to return has been proven. *Id.*

Article 13(b) provides that a child need not be returned if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention art. 13(b). Grave risk is an affirmative defense that must be proved by clear and convincing evidence. 22 U.S.C. § 9003(e)(2). Concern with comity among nations argues for a narrow interpretation of the 'grave risk of harm' defense, but the safety of children is paramount. *Van De Sande v. Van De Sande*, 431 F.3d 567, 572 (7th Cir. 2005) (quotation omitted); *Danaipour v. McLarey*, 286 F.3d 1, 22 (1st Cir. 2002); *see also Colchester v. Lazaro*, 16 F.4th 712, 717 (9th Cir. 2021). In deciding whether grave risk exists, courts are to consider "both the magnitude of the potential harm and the probability that the harm will materialize." *Colon v. Montufar*, F. Supp. 3d 1280, 1292 (S.D. Fla. July 2, 2020) (citing *Souratgar v. Fair*, 720 F.3d 96, 103 (2d Cir. 2013)). A respondent parent can establish a grave risk of harm from abuse "where the petitioning parent had actually abused, threatened to abuse, or inspired fear in the children in question." *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014). Spousal violence may also "establish a grave risk of harm to the child, particularly when it occurs in the presence of the child." *Id.*; *see also Gomez v. Fuenmayor*, 812 F.3d 1005, 1007 (2016).

Here, Mother accused Father of domestic violence, as well as use of physical discipline against the children. Dkt. 26 at 5. The Court will address each accusation in turn.

**2. Domestic Violence**

Mother alleges that during a 2017 altercation, Father pushed Mother to the ground, shattered a nearby nightstand, and dragged her into the balcony area of their twelfth-floor residence. Dkt. 65 at 6. Father, later texted Mother to say that he "can't believe [he] let it go that far" corroborates the seriousness of the incident and is inconsistent with his later effort to characterize the conduct as protective or justified. Joint Exs. 101-109. Father admits that he broke a nightstand and pushed Mother out of the room, but disputes dragging Mother to the balcony. Dkt, 34-1 at 3.

During a later altercation in 2023, Mother says Father punched her in the chest, resulting in a visit to the emergency room. Joint Exs. 113, 120. Father claims there was a tussle with Mother because she tried to take his phone and that mother's own hand hit her chest. Dkt. 66 at 5.

Father presented evidence that Mother threatened to harm him via text and that she sent him inflammatory messages regarding her relations with other men. Dkt. 66 at 4. The Court does not condone Mother's behavior, however this is not sufficient evidence that Mother was abusive towards Father.

Mother's expert on domestic violence, Dr. Dobson, said that Mother showed signs of having experienced "extreme abuse" by Father. *Id.* Though the Court cannot know exactly what transpired between Father and Mother in 2017 and 2023, the Court credits the testimony of Dr. Dobson in that Mother is clearly fearful of Father and finds that at least one of the children may have been present to witness Father's actions.

**3. Physical Discipline**

Father admits that he utilized physical discipline a single time against K.E.N. Mother claims there were several more instances. Dkt. 26 at 5. The incident Father admits to involved Father striking K.E.N with a stick—resulting in bruising and marks that Father covered with bandages. Dkt. 34-1 at 2. K.E.N was further kept from going to school and told that when she returned to school, not to tell anyone about the incident according to testimony by the Guardian ad Litem, which the Court credits. *Id.* When K.E.N was perceived to have misbehaved by her Father, she was made to kneel as punishment. The Court also finds that K.E.N was likely hit by a coat hanger during one of the instances she was kneeling and that Father also made contact with K.E.N's head with one of her metal leg braces, further crediting the testimony of the Guardian ad Litem. *See Id.* The Court is deeply alarmed by the pattern of physical harm to K.E.N, alongside Father's conduct concealing injury. K.E.N also expressed to the Court during her March 11, 2026 interview that she did not believe her Father was going to change his behavior towards her if she misbehaved in the future.

There is no evidence that Father ever hit S.A.N and in the Court's interview with S.A.N on March 11. 2026 she did not express that Father had never hit her. During the two months that S.A.N was in South Korea during summer 2026, there are similarly no allegations of physical abuse of S.A.N by Father.

Father's admitted physical abuse of K.E.N and avoidance of mandated reporters, alongside K.E.N's fear of her father hitting her makes it untenable that K.E.N would be able to safely live with Father without risk of grave danger. The evidence presented by Mother meets the clear and convincing standard required to establish a grave risk of harm under Article 13(b). *See* Hague Convention art. 13(b). However, given S.A.N's differing experiences, the Court finds that unlike K.E.N, S.A.N should be returned to South Korea.

**D. Remedial Measures**

Father has said he voluntarily enrolled in a Batterer Intervention Program in Los Angeles, completing 25 of 52 weeks of the program as of the time of closing arguments. Dkt. 66 at 7. He has further represented that he has undergone parenting classes, personal therapy, and courses in parenting adolescents and children. *Id.*

Should the Court find grave risk of harm by clear and convincing evidence, Father has said that he would be willing to submit to ameliorative measures such as: the appointment of a guardian ad litem in Korea, therapy for the children with a psychologist able to communicate with the guardian ad litem, a separate and safe apartment for Mother to live in South Korea when visiting, holiday travel for the children to the United States, and an order that Mother not be arrested for removing the children from South Korea. *Id.* at 18-19.

Dr. Dobson explained that concealing injuries, avoiding mandated reporters, and reframing violence as loving discipline reduce the visibility of harm and make safeguards dependent on reporting and voluntary compliance less reliable. (Dobson Decl., paragraphs 5-12.) The Court finds this testimony to be credible. Even S.A.N was unwilling to answer questions about the disciplinary actions her father took against K.E.N and Father has admitted that he has created an environment of secrecy around the hitting of K.E.N. In the face of these

factors, the Court does not find that the ameliorative measures suggested by Father would suffice in keeping K.E.N safe.

**V. CONCLUSION**

A child must be returned to its habitual residence if Petitioner has proven their case by a preponderance of the evidence. Petitioner has met their burden, thus the duty to return is mandatory for S.A.N. only.

This Court **ORDERS** that S.A.N be returned to South Korea to reside with Father and that due to grave risk, K.E.N remain in the United States with Mother.

DATED: September 4, 2026



DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

## ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

**Wrongful Taking of S.A.N and K.E.S**

In August 2021, with Father's express consent, Mother relocated with both children to Irvine, California. K.E.N. enrolled in school, and the children lived in California for nearly one year. They were enrolled in Irvine schools from July 2021 to December 2021, when S.A.N. returned to Korea. K.E.N. was returned to Korea in June 2022 to reside with Father. The children resided in South Korea ever since their return.

During a visit with K.E.N. and S.A.N., on July 31, 2025, Mother wrongfully removed the children from Korea when Father was out of town on a church retreat. Rather than taking the children to an agreed upon holiday to Tokyo Disneyland, located in Tokyo, Japan, Mother instead took the children to California on an airplane, using their Korean passports, to enter the United States of America.

**Habitual Residence**

The Court finds that Father has proven by a preponderance of the evidence that the parties' minor children, K.E.N. and S.A.N. were habitual residents of the Republic of Korea at the time Mother removed them from Korea to California on July 31, 2025.

Immediately before July 31, 2025, the children had lived in Korea for substantial periods, attended school there, developed routines, and maintained friends and family relationships there. The Court has given those circumstances substantial weight because they favor Father's claim that Korea was the children's habitual residence.

Father also meets his burden of establishing by a preponderance of the evidence that the removal of the children by Mother was in breach of Father's custody rights under the laws of Korea, and that Father was exercising those rights at the time of the removal.

**Physical Abuse and Concealment**

In 2024, Father struck K.E.N. with a stick. Father admitted that conduct at trial and again in his February 2, 2026 declaration. (Dkt. 34-1, paragraph 3; Joint Ex. 124.)

Father has readily admitted that in April of 2024, he physically disciplined K.E.N., when she was nine years old, by having her kneel before him and he hit her with a plastic stick. Father testified he kept K.E.N. out of school and took her to a children's park, and clearly recalls placing bandages on the red marks left by the discipline.

Father instructed K.E.N. not to tell anyone about the incident and did not disclose the abuse to Mother. Father admitted both concealment decisions in his February 2 declaration. (Dkt. 34-1, paragraphs 3, 7.)

Father knew that Korean law prohibited the conduct and that disclosure could result in loss of custody and criminal prosecution. He also knew that teachers and medical professionals were required to report suspected abuse. (Dkt. 34-1, paragraph 8.)

The Guardian ad Litem testified that Father kept K.E.N. out of school so teachers and other mandated reporters would not see the marks and bruises. The Court credits the Guardian ad Litem’s testimony and K.E.N.’s disclosure on this point.

The stick incident was not isolated. The Guardian ad Litem testified that Father struck K.E.N. with a wire hanger while forcing her to kneel. The Court credits that testimony and finds that the hanger incident occurred.

The Court also credits K.E.N.’s disclosure that Father struck her on the head with her metal leg brace in 2023.

The Court interviewed the children on March 11, 2026. K.E.N. testified that Father had hit her in 2024, with a plastic stick, covered marks on her skin with band aids, and told her not to tell anyone. She testified she went to school, was questioned by her teachers about the bandages, went home, and Father took her to a children’s park. She also recalled, after direct questions, that when she was much younger, maybe in Kindergarten, that Father had made her kneel and hold out her hands, and had hit her with children’s clothing hangers, rice paddles or spoons, and other small objects. She said he had promised never to do it again so when he hit her in 2024, it made her distrust her Father. She also testified that she was afraid her father would hit her again if she did something wrong.

The Court credits the portions of Dr. Leslie Dobson's testimony and declaration admitted for the limited purpose of evaluating concealment, trauma-based silence, and the practical operation of protective measures. Dr. Dobson explained that concealing injuries, avoiding mandated reporters, and reframing violence as loving discipline reduce the visibility of harm and make safeguards dependent on reporting and voluntary compliance less reliable. (Dobson Decl., paragraphs 5-12.)

**Domestic Violence**

In 2017, Mother alleges that Father pushed Mother to the ground, shattered a glass table or nightstand during the altercation, and dragged or forced her onto the balcony area of the parties' twelfth-floor residence. Father's contemporaneous message that he "can't believe [he] let it go that far" corroborates the seriousness of the incident. (Joint Exs. 101-109.)

In 2023, Mother alleges that Father punched Mother in the chest during an argument. Mother thereafter sought emergency medical care. (Joint Exs. 113, 120.) Father claims that Mother injured herself while attempting to retrieve a cellular telephone in a tussle between them.

Mother sent insulting and disparaging communications during the parties' acrimonious relationship. That conduct was inappropriate. However, this behavior did not involve physical violence toward the children, concealment of injuries, or evasion of child-protection systems, and it does not negate the risk established by Father's conduct.

**Ameliorative and Protective Measures**

Father proposed counseling, parenting classes, school reporting, child therapy, appointment of a Korean guardian ad litem, transmission of this Court's order to schools and professionals, separate housing for Mother, and promises of compliance as ameliorative measures.

Father voluntarily enrolled in a Batterer Intervention Program in Los Angeles, and has participated each week, completing 25 of 52 weeks of the program as of the time of closing arguments. He has undergone parenting classes, personal therapy, and courses in parenting adolescents and children.

Mother has undergone personal therapy.

## CONCLUSIONS OF LAW

**Legal Background- Hague Convention**

This case arises under the Hague Convention's International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§9001 *et seq.*

The 1980 Hague Convention on the Civil Aspects of International Child Abduction is a multilateral treaty that provides authority for the expeditious physical return of a child who has been removed or retained from the habitual residence, in violation of the custody rights of the left-behind parent. Hague Convention on the Civil Aspects of International Child Abduction pmbl., arts. 1, 3, Oct. 25, 1980, 1343 U.N.T.S. 89.

The United States signed the 1980 Hague Convention in 1981, and Congress ratified the Convention in 1986. Hague Convention, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89. South Korea is also a party to the convention. *Id.*; Hague Conference on Private International Law, Status Table, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 (Feb. 11, 2025). Congress then passed implementing legislation, the International Child Abduction Remedies Act (ICARA) in 1988. 22 U.S.C. §§ 9001–9011 (1988), Pub. L. 100–300, § 2, Apr. 29, 1988, 102 Stat. 437.

The primary purpose of the Hague Convention was to preserve the status quo that existed before a child's removal, and to deter would-be abductors from removing children to other jurisdictions in search of a more sympathetic court. Pub. Notice 957, 51 Fed.Reg. 10494, 10505 (1986).

The policy underlying the Convention is "the interest of children . . . in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence." *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) (internal citation and quotation omitted).

The Court's purview is limited to deciding if a child was wrongfully removed or retained away from their habitual residence, and if so, to order the child's return to that nation. *Id.* at 671-72 (citing 22 U.S.C. § 9003(e)(1), § 9001(a)(4)).

The elements of the case for return are that the person or parent petitioning for the return must show by a preponderance of the evidence that the child:

1. Is under the age of sixteen;
2. Has been wrongfully removed or retained;
3. Has been wrongfully removed or retained from his or her habitual residence; and
4. Has been wrongfully removed or retained in violation of the custody rights of the left-behind parent.

Hague Convention art. 3-4, Oct. 25, 1980, 1343 U.N.T.S. 89; 22 U.S.C. § 9003(e)(1) (establishing the burden of proof).

If the petitioner has proven the elements above in accordance with their burden, the Court must order the return of the child unless a defense to return is established. Hague Convention arts. 12–13, 20, 1343 U.N.T.S. 89; 22 U.S.C. § 9003(e)(2).

**Habitual Residence**

The determination of habitual residence is "a fact-driven inquiry into the particular circumstances of the case." *Monasky,* 589 U.S. at 79. It is a totality-of-the-circumstances approach that examines the "family and social environment in which [the child's] life has developed." *Id.* at 77 (internal citation omitted).

Factors relevant in this analysis are the child's age, meaningful connections with the people and place in the new country, immigration status of the caregiving parents, and the length of time the child was physically located in a particular place. *Id.* at 78 n.3 (internal citations omitted).

**Habitual Residence - Physical Presence**

While physical presence of the child alone is not dispositive, it must be considered alongside meaningful social connections and a sense of environmental normalcy. *See Nisbet,* 124 F. 4th at 584 (citing *Monasky,* 589 at 81). When physical presence fails to yield meaningful social connections, courts assign it little weight in habitual-residence determinations. *Id.*

This case is distinct from *Nisbet,* where the Ninth Circuit held that children lacked meaningful ties to Scotland despite physical presence, because, in that case, the children had not formed friendships at nursery school, had no contact with their extended family, and had a father who had been incarcerated since birth. *See* 124 F.4th at 585.

Both children's physical presence for the majority of their lives was in South Korea—where their paternal family resides. The children have significant familial and social ties to South Korea, which strongly supports the conclusion that South Korea, rather than the United States, is their habitual residence.

**Violation of Custody Rights Under South Korean Law**

After determining habitual residence, the Court must determine (1) whether Mother's removal of the child breached Father's custody rights under South Korean law and (2) whether Father was exercising those rights at the time of removal. *See* Hague Convention art. 3-4, Oct. 25, 1980, 1343 U.N.T.S. 89; 22 U.S.C. §9003(e)(1) (establishing the burden of proof).

Custody rights can be established by (1) operation of law, (2) judicial or administrative decision, or (3) agreement between the parents. Hague Convention art. 3, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89.

Korean law mandates that parental authority is exercised jointly over minor children. *See* Korean Civil Act art. 909(2) (S. Kor.). If parents are unable to reach an agreement, the Korean family court steps in. *Id.* At no point did mother appeal to the Korean family court for guidance over where the children shall reside. Instead, she simply took the children in violation of Korean law.

Father had custody rights under South Korean law, and Mother's unilateral removal of the children without Father's consent or court authorization constituted a breach of those rights.

**International Comity and the Hague Convention**

The Hague Convention was founded on principles of international comity, ensuring that courts respect the custody determination of other signatory nations. *Souratgar v. Fair*, 720 F.3d 96, 108 (2nd Cir., 2013) ("the careful and thorough fulfillment of our treaty obligations stands not only to protect children abducted to the United States, but also to protect American

children abducted to other nations-whose courts, under the legal regime created by this treaty, are expected to offer reciprocal protection.") (international citation and quotation omitted).

By disregarding South Korean law and removing the children without legal authorization, Mother acted in clear violation of Father's custodial rights.

**Mother's Defenses- Grave Risk of Harm**

There is a uniform acknowledgement among courts that the defenses available under the Convention should be interpreted narrowly. *See, e.g., Nicolson v. Pappalardo*, 605 F.3d 100, 107 (1st Cir. 2010); *Asvesta v. Petroutsas*, 580 F.3d 1000, 1004 (9th Cir. 2009); *Baran v. Beaty*, 526 F.3d 1340, 1345 (11th Cir. 2008) (using Article 13(b) defense); *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 271 (3d Cir. 2007) (using Article 13 defense); *Karkkainen v. Kovalchuk*, 445 F.3d 280, 288 (3d Cir. 2006); *Miller v. Miller,* 240 F.3d 392, 402 (4th Cir. 2001); *Diorinou v. Mezitis*, 237 F.3d 133, 145 (2d Cir. 2001); *England v. England*, 234 F.3d 268, 272 (5th Cir. 2000); *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996); *Rydder v. Rydder*, 49 F.3d 369, 372 (8th Cir. 1995).

Article 18 provides that the defenses "do not limit the power of a judicial or administrative authority to order the return of the child at any time." Hague Convention art. 18. Thus, if the return of a child would further the aims of the Convention, Article 18 confers discretion to return a child even if a defense to return has been proven. *Id.*

Article 13(b) provides that a child need not be returned if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Id.* at art. 13(b).

Grave risk is an affirmative defense that must be proved by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A). In deciding whether grave risk exists, courts are to consider "both the magnitude of the potential harm and the probability that the harm will materialize." *Colon v. Montufar*, F. Supp. 3d 1280, 1292 (S.D. Fla. July 2, 2020) (citing *Souratgar v. Fair*, 720 F.3d 96, 103 (2d Cir. 2013)).

A respondent parent can establish a grave risk of harm from abuse "where the petitioning parent had actually abused, threatened to abuse, or inspired fear in the children in

question." *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014). Spousal violence may also "establish a grave risk of harm to the child, particularly when it occurs in the presence of the child." *Id.*; *see also Gomez v. Fuenmayor*, 812 F.3d 1005, 1007 (2016).

The evidence presented by Mother does meet the clear and convincing standard required to establish a grave risk of harm under Article 13(b) for K.E.N only. The clear-and-convincing showing rests on direct evidence, not speculation: Father admitted striking K.E.N. with a stick, causing bruises, instructing her not to tell, and failing to inform Mother. He understood the conduct was unlawful and that teachers and doctors were mandated reporters. The Guardian ad Litem corroborated that Father kept K.E.N. home while the injuries were visible. The Court also credited the hanger, forced-kneeling, and leg-brace incidents.

**Ameliorative Measures Do Not Lead to Return**

Once grave risk is established, Article 13(b) lifts the Convention's otherwise-applicable return mandate and leaves the Court with discretion to grant or deny return. *Golan v. Saada*, 596 U.S. 666, 676-82 (2022). A court is not categorically required to examine every imaginable measure before denying return. It ordinarily should address measures raised by the parties or obviously suggested by the circumstances, but it may reject measures that are unworkable, ineffective, would intrude into custody merits, or would prolong the proceeding without reliably protecting the child. *Id.*; *Radu v. Shon*, 62 F.4th 1165, 1169-77 (9th Cir. 2023).

The Court has considered each category of measure Father proposed. Promises against corporal punishment are inadequate because Father previously concealed the abuse and gave materially incomplete sworn testimony. Therapy and a batterer's program do not eliminate the risk because Father began them only after litigation exposure and there is no guarantee that completion will lead to durable change. School, therapist, or guardian reporting cannot sufficiently protect the children because Father previously kept K.E.N from school and directed her not to report. The existence of Korean child-protection laws does not resolve the case specific problem. Father admitted that he knew those laws, feared their consequences, and concealed the abuse for that reason. The question is not whether Korean law prohibits abuse; it

does. The question is whether the measures proposed here would sufficiently mitigate the proven risk before and after a violation. The record shows they would not.

## IV. CONCLUSION

A child must be returned if Petitioner's burden is met, and the wrongful removal or retention took place within twelve months of the commencement of the proceedings. The duty to return is mandatory.

This Court **ORDERS** that S.A.N be returned to South Korea to live with her Father. K.E.N will remain in the United States with her Mother.